QUALITY SERVICE RAILCAR *v.* Jadell WILLIAMS
and Second Injury Fund

CA 90-509                                                820 S.W.2d 278

Court of Appeals of Arkansas
Division II
Opinion delivered October 30, 1991

*Lavender, Rochelle, Barnett and Dickenson*, by: *Charles D. Barnett*, for appellant.

*Dowd, Harrelson, Moore and Giles*, by: *C. Wayne Dowd*, for appellee Jadell Williams.

*E. Diane Graham*, for appellee Second Injury Fund.

MELVIN MAYFIELD, Judge. This is the second appeal in this Workers' Compensation case. In the first appeal we issued an unpublished opinion by which this case was reversed and remanded to the Commission for a determination as to whether the employer was given timely and proper notice of the claimant's alleged occupational disease within the requisite 90-day period and, if not, whether claimant's failure to do so fell within one of the statutory exceptions. Upon remand the Commission again awarded the claimant permanent partial disability benefits in an amount equal to 70% to the body as a whole. It is from this decision that the employer has now appealed.

A brief review of the facts is in order. The claimant was, at the time of the first hearing, a 64-year-old man who suffered from chronic obstructive pulmonary disease. The claimant had been employed by appellant as a carman and crane operator cleaning, repairing and overhauling railroad tank cars for approximately 21 years. While performing his job, the claimant was required to go down into railroad tank cars which had been steam cleaned but which still contained strong odors from previous loads. There was testimony that the cars contained anything from grain to asphalt to chemicals. The claimant was required to scrape rust and other substances from the interior walls of the tank cars and install fiberglass insulation. The claimant testified that the air he was forced to breathe in the tank cars contained fiberglass particles, chemical fumes, welding smoke and fumes, rust dust and paint fumes. Furthermore, the claimant had been a one-pack-a-day smoker for almost 30 years but had quit smoking in 1969 (when he was 45 years old).

In 1975 the claimant was diagnosed as having chronic obstructive pulmonary disease and acute bronchitis. He was hospitalized and treated but eventually was able to return to work. He continued to work for appellant until July 1985 when he developed breathing problems so severe he was unable to work. He took sick leave and annual leave for the remainder of 1985, attempted to work a few days in January 1986 but could not, then retired.

Dr. C.T. Marrow, who examined appellant on November 19, 1985, reported that the claimant was not able to continue work at North American Tank Car (the predecessor of Quality Service Railcar) because of the necessity of using a cutting torch and exposure to excessive environmental pollutants. By deposition Dr. Marrow testified that the claimant has predisposition to lung disease when exposed to industrial irritants, paint and welding fumes or other pollutants; that he has hyperirritable, hyper-responsive bronchi, and sensitivities to allergens, to dust, pollen, and a host of other things. He said that when a man who has this predisposition to lung disease is exposed to industrial irritants, paint and welding fumes or other pollutants, "it is a disaster waiting to happen." In a letter written to the Social Security Administration on February 25, 1986, Dr. Marrow stated:

Mr. Jadell Williams, date of birth 3/15/24, is unable to continue work at Quality Service Railcar Repair Corporation because of the high level of air pollution. On each occasion of his returning to work, Mr. Williams has had severe respiratory distress, and on occasions, loss of consciousness. Working there, he is exposed to paint fumes, welding fumes, dust, sanding fumes, as well as chemical fumes.

. . . He has extensive pulmonary fibrosis, which has progressed rapidly since his last visit to this office because of inhalation of fumes.

On August 11, 1987, Dr. Joseph H. Bates, a pulmonary specialist at the University of Arkansas Medical Center at Little Rock, reported:

I am writing to provide my report regarding the medical condition of Mr. Jadell Williams of Fouke, Arkansas. In coming to my opinions I reviewed depositions given by Dr. Marrow of Texarkana, Mr. Williams and his wife, and medical reports from Drs. Pappas, Haynie, Marrow, Patelle, and Stevens. In addition I had a telephone conversation with Dr. Stephen Parrish, the physician who cared for Mr. Williams when he was hospitalized in Texarkana during July, 1987. My conclusions are based on an analysis of all of these data, together with my own assessment following an interview and physical examination, and the

review of blood tests, pulmonary function results, and chest x-rays made at the University of Arkansas Medical Center.

.   .   .   .

The major question is-did his work cause him to have bronchospastic disease? He worked on cars that had hauled plastic pellets, dietomaceous earth, clay, starch and grain, according to Mr. Benny Sinyard of Quality Service Railcar Repair Corporation. Most patients who develop bronchospastic disease at this age have no identifiable cause, except for cigarette abuse. . . .

It seems probable to me that Mr. Williams was born with a genetic predisposition to develop bronchospastic airways disease. He most probably would not have had this problem had he not abused tobacco. However, he stopped smoking in 1969 and the airways disease continued to worsen after this and has been especially severe in the 1980's. It would not be correct to state that the work environment caused the disease, but it is true that strong odors and perhaps antigens from material hauled in the cars could induce episodes of bronchospasms in a person already diseased.

No reasonable physician would try to set out percentages regarding the weight of the various factors that caused him to develop bronchospastic lung disease. I have concluded that the two most important factors in his illness are a genetic predisposition and abuse of tobacco. The work environment made the process worse after it was established. Being away from the work environment will not prevent episodes in the future.

On this evidence the Commission found that the claimant was permanently and totally disabled, and although the work had not caused the claimant's condition, his condition had been aggravated by his employment with appellant. The Commission also held that under Ark. Code. Ann. § 11-9-601(c)(1) (1987), it was required to reduce claimant's compensation to the proportion attributable to his occupational disease. Dr. Marrow had found that the claimant suffered a 40% loss in pulmonary function,

which rendered the claimant permanently and totally disabled. He found 12% of the 40% attributable to cigarette smoking and 28% attributable to the employment. The Commission found that this converted to a permanent partial disability of 70% to the body as a whole and this percentage was attributable to claimant's employment.

In the previous appeal we remanded the case to the Commission to make a finding of fact regarding compliance with the requirement of a 90-day written notice of occupational disease and, if the requirement had not been met, to determine whether the failure was excusable under one of the statutory exceptions. Upon remand the Commission found that the claimant suffered from a preexisting pulmonary disease which was aggravated by his exposure to pollutants at work; that the time period runs from the first distinct manifestation of a disease cognizable under workers' compensation, not the first distinct manifestation of the disease; that the claimant was not aware his pulmonary condition was "a disease cognizable under workers' compensation" until he attempted to return to work in January 1986, and suffered "a clear relapse"; and that on March 3, 1986, Dr. Marrow notified the appellant of the claimant's work-related condition "by indicating on the insurance claim form the claimant's condition arose out of his employment due to the exposure to various inhalants." The Commission further found that even if the first distinct manifestation of an occupational disease occurred prior to January 1986, it would excuse the failure to give timely notice to the employer.

On appeal appellant first argues that the Commission erred in holding that the claimant had proven by clear and convincing evidence that his preexisting pulmonary disfunction was aggravated by his employment with appellant. When reviewing a decision of the Workers' Compensation Commission, we must view the evidence and all reasonable inferences deducible therefrom in the light most favorable to the findings of the Commission and affirm that decision if it is supported by substantial evidence. *Clark* v. *Peabody Testing Service*, 265 Ark. 489, 579 S.W.2d 360 (1979). The issue is not whether we might have reached a different result or whether the evidence would have supported a contrary finding; if reasonable minds could reach the Commission's conclusion, we must affirm its decision.

*Bearden Lumber Company* v. *Bond*, 7 Ark. App. 65, 644 S.W.2d 321 (1983).

Appellant argues that the various doctors disagree on whether or not the claimant's condition was related to his work; that there was medical testimony that various odors and fumes in environments other than the work place would bring on an attack; that many environmental and emotional problems could trigger an attack; and that the building in which the claimant worked was well ventilated. Nevertheless, there was ample medical and lay evidence on which the Commission could rely in reaching its conclusion. Thus, we cannot say that reasonable minds with the same evidence before them could not reach the conclusion reached by the Commission.

Next appellant argues that the Commission erred in holding that the claimant-appellee is entitled to permanent partial disability benefits in an amount equal to 70% of the body as a whole. Appellant argues that Dr. Marrow was the only physician who even attempted to place an estimate on the claimant's loss of use of the lungs and that the Commission strains to extrapolate a 40% loss of the use of the lungs into a permanent and total disability. We disagree. The Commission has found that the claimant is permanently and totally disabled as a result of his lung disease and its consequences. That finding is supported by substantial evidence. Dr. Marrow attributed 12% of the 40% to cigarette smoking and 28% to the exposure to irritants at work. Ark. Code Ann. § 11-9-601(c)(1) (1987) provides:

> Where an occuptional disease is aggravated by any other disease or infirmity, not itself compensable, or where disability or death from any other cause, not itself compensable, is aggravated, prolonged, accelerated, or in any way contributed to by an occupational disease, the compensation payable shall be reduced and limited to the proportion only of the compensation that would be payable if the occupational disease were the sole cause of the disability or death as the occupational disease, as a causative factor, bears to all the causes of the disability or death.

Thus, under the situation in this case, the above statute requires that "the compensation payable shall be reduced . . . to the proportion . . . of the compensation that would be payable if

the occupational disease were the sole cause of the disability . . . as the occupational disease, as a causative factor, bears to all the causes of the disability." Under the evidence, the claimant is 100% disabled. However, that 100% must be reduced to the proportion that the occupational disease bears to all other causes of disability. Since the 100% disability results from the 40% loss of the lungs, and 28% of the lung-loss was caused by occupational disease, then 40% is to 100% as 28% is to $x$. Mathematically, this relationship can be written as $40{:}100 = 28{:}x$, and to determine the unknown term of this proportion, we multiply the means by the extremes. See 15 The World Book Proportion 831-32 (1990). This multiplication produces $40x = 2800$, and the division of those numbers makes $x$ equal to 70%. Thus, the Commission's finding that the appellant is liable for 70% of the claimant's disability is not erroneous. Appellant's suggestion that its liability is only 28% of 40%, or 11.20% of the total disability, is obviously flawed. That calculation would make appellant liable for only the loss of the use of the lungs which was caused by claimant's occupational disease. Appellant's obligation, however, is for the disability of the *man* which was caused by the occupational disease.

Appellant also argues that the Commission erred in holding there was no basis for Second Injury Fund liability. It contends that the Commission "in essence" found that Section 13 (Ark. Code. Ann. § 11-9-525) and Section 14 (Ark. Code Ann. § 11-9-601) of the Workers' Compensation Act are mutually exclusive, and appellant argues that the Commission was wrong in that regard. However, both the claimant and the Second Injury Fund think the Commission was right. The Fund points out that Section 14, which is now codified as Ark. Code Ann. § 11-9-601 (1987), provides in § 11-9-601(a) that "where an employee suffers from an occupational disease . . . and is disabled or dies as a result of the disease . . . the employee, or, in case of death, his dependents, shall be entitled to compensation as if the disablement or death were caused by injury, *except as otherwise provided in this subchapter.*" (Emphasis added). An exception "otherwise provided" is found in Ark. Code Ann. § 11-9-601(c)(1) (1987), which we have already quoted in this opinion, and as we have pointed out, that section contains provisions which clearly state that where an occupational disease is aggravated by

a non-compensable disease the compensation payable is limited to the proportion of compensation that would be payable if the occupational disease were the *only* cause of disability. That is the formula that the Commission applied in this case, and it found that the claimant's work caused 70% of the claimant's disability. Both of the appellees in this case rely upon *Jenkins* v. *Halstead Industries*, 17 Ark. App. 197, 706 S.W.2d 191 (1986), in which we affirmed the Commission's finding that the appellant's emphysema was 92% attributable to cigarette smoking and 8% attributable to his work. We stated:

> We agree with the Commission's conclusion that the legislature did not intend for our occupational disease apportionment statute to be interpreted and applied in the same manner as our accidental injury apportionment statute . . . .

17 Ark. App. at 201. Both of the appellees recognize that "this is simply not a Second Injury Fund case."

In its opinion of September 28, 1990, the Commission pointed out that Ark. Code Ann. § 11-9-601(f)(1) places liability for occupational disease on "the employer in whose employment the employee was last injuriously exposed to the hazards of the disease," and that the employer's liability is limited by Ark. Code Ann. § 11-9-601(c)(1) to the proportion that the occupational disease bears to all causes of the disability. In contrast, the Commission also pointed out that the Second Injury Fund statute, Ark. Code Ann. § 11-9-525, is designed "to limit the employer's liability to the amount of disability or impairment suffered by the employee during his employment with that employer." The Commission reached this conclusion:

> Here a noncompensable pulmonary dysfunction was aggravated by an occupational disease. Therefore, the Administrative Law Judge was correct in apportioning liability for the degree of claimant's permanent disability pursuant to § 601(c)(1) and in dismissing the Second Injury Fund from this case.

We believe the Commission's decision on this point is clearly supported by both the evidence and the law.

Next, appellant argues that the Commission erred in finding

that the claim was not barred by the claimant's failure to give appellant notice of the occupational disease "within ninety (90) days after the first distinct manifestation thereof." *See* Ark. Code Ann. § 11-9-603(a)(2) (1987). Appellant contends that the claimant became aware of his occupational disease in July 1985, and did not notify the employer until March 3, 1986. Furthermore, appellant argues that the claimant first became aware that his condition was related to his work in 1975 when he was told by Dr. Haynes in Shreveport that he needed to get away from his work environment.

■ The Commission found that the claimant was not aware, until he attempted to return to work in January 1986 and was not able to do so, that he suffered from a disease cognizable under workers' compensation. The Commission relied on *Desoto, Inc.* v. *Parsons*, 267 Ark. 665, 590 S.W.2d 51 (Ark. App. 1979), for the rule that the time period for notice to the employer begins to run from "the first distinct manifestation of a disease cognizable under workers' compensation, not the first distinct manifestation of the disease." Although the *Parsons* case involved an injury rather than an occupational disease, the court in *Parsons* quoted with approval the following statement by the Commission: "Claimant was not in a position to give notice of injury because she wasn't aware, until notified by her union, that she had a claim cognizable under workers' compensation." We think the rule stated by the Commission in the present case is correct. Another way to express the same rule is found in *Woodard* v. *ITT Higbie Mfg. Co.*, 271 Ark. 498, 609 S.W.2d 115 (Ark. App. 1980), where the court said, "the statute does not begin to run until the employee knows or should reasonably be expected to be aware of the extent or nature of his injury." We also agree the evidence in this case supports the finding that it was not until January 1986, when the claimant was unable to continue working, that he realized he was suffering from an occupational disease, and it is not disputed that the employer learned on March 3, 1986, that the claimant was contending his condition was work related. Moreover, the Commission found that any failure to give timely notice of claimant's occupational disease was excusable. The Commission said the evidence shows that the employer had as much knowledge of the causal connection between the claimant's work and his disease as the claimant did. Under the case of *Peerless*

*Coal Co.* v. *Gordon*, 237 Ark. 152, 372 S.W.2d 240 (1963), the authority of the Commission to excuse the failure to give notice under the statute relating to an injury (now Ark. Code Ann. § 11-9-701) would also apply to the failure to give notice of occupational disease as required under Ark. Code Ann. § 11-9-603. We affirm the Commission's finding that any failure to give notice was excusable.

Finally, the appellant argues the Commission erred in finding that the claimant is due a period of temporary total disability for 18 months from the cessation of his employment on or about July 4, 1985. Appellant again relies on selected portions of the medical testimony to support its theory that the claimant's condition could be aggravated by a plethora of allergens, whether at work or at home, and argues that the medical evidence taken as a whole dictates that appellee's employment was not such that the hazards of such disease actually existed or that the characteristics thereof were peculiar to the trade, occupation, process or employment.

The record shows that the claimant became unable to breathe around July 4, 1985, and was hospitalized for several days. In the next year and a half he required hospitalization or treatment 36 times. He attempted to return to work in January 1986 but was unable to do so. Dr. Marrow testified:

> There was permanent damage to the tune of roughly 40%, permanent damage which was maintained even nine months after leaving North American. But the airways themselves have shown a tremendous ability to rebound and improve. He has had a 34% improvement, a 23% lung function when he left North American to a little better than 50% nine months later. So these small airways are up to 51.7% from 23% over a period of nine months. So his small airways and large airways continue to improve. The time of improvement until he reaches what is called a steady stage, there is no further healing, is probably in the range of a year and a half. No doctor has a crystal ball and can give an exact time but if I had to make a guess that at 18 months he would continue to show some improvement in lung function barring a pneumonia or doing some welding or some crazy thing like going duck hunting and falling out

of the boat and getting pneumonia or something like that. If he doesn't do something crazy to damage his lungs further he should show continued but lessening improvement in his lung function up to about 18 months after leaving work.

In light of this testimony we cannot say the decision of the Commission to award the claimant 18 months of temporary total disability is not supported by substantial evidence.

Affirmed.

JENNINGS and DANIELSON, JJ., agree.